## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Jun 27 2016, 5:31 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Mark Small
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

Robert J. Henke
Abigail R. Recker
Deputy Attorneys General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In the Matter of the Termination of the Parent-Child Relationship of: B.C., Minor Child,

and

A.C., Father,

*Appellant-Respondent*,

v.

The Indiana Department of Child Services,

*Appellee-Petitioner*.

June 27, 2016

Court of Appeals Case No. 54A04-1512-JT-2163

Appeal from the Montgomery Circuit Court

The Honorable Harry A. Siamas, Judge

Trial Court Cause No. 54C01-1508-JT-192

**Brown, Judge.**

[1] A.C. ("Father") appeals the involuntary termination of his parental rights with respect to his son B.C. Father raises one issue which we revise and restate as whether the evidence is sufficient to support the termination of his parental rights. We affirm.

*Facts and Procedural History*

[2] In 2007, Father was convicted of burglary. While Father was incarcerated, he had a son, D., born on October 10, 2007. Father was then convicted of escape from house arrest for cutting his house arrest bracelet and running in 2008. D. has lived with his maternal grandmother since 2008.

[3] At some point in 2012, Father met K.C. ("Mother") about a month after he was released from prison following a term of incarceration of about five years for burglary and escape. At some point, Mother and Father married. While Mother was pregnant, Father went to Pennsylvania in March 2014 because he "was going on a job." Transcript at 35. He met a woman there who became his girlfriend, and he stayed with her. He did not provide any support to Mother while he lived in Pennsylvania. Mother was living at Pam's Promise when B.C. was born on July 7, 2014, and then she moved in with Father's mother. About a week after B.C. was born, Father returned to Indiana and also moved in with his mother.

[4] On July 25, 2014, Hannah Dossett, an assessor employed by the Department of Child Services ("DCS"), received a report that there was a concern that Father

and Mother were under the influence of drugs, that they did not have sufficient means to care for B.C., that they were homeless, and that there was a concern "just all around for [B.C.'s] well being at that time." *Id.* at 22. Dossett determined that Father and Mother were staying together with friends, that Father had just returned from Pennsylvania, and that they were homeless.[1] While Father and Mother were "couch surfing," B.C. had spent most of his time with his paternal grandmother. *Id.* at 33. Dossett spoke with Father, and he denied using drugs at that time but admitted to using pseudoephedrine for a cold. Father provided Dossett with a drug screen, which later tested positive for traces of methamphetamine. Father told Dossett that he did not sign the birth certificate so "legally he was not the father" of B.C. *Id.* at 24. DCS removed B.C. and placed him with the paternal grandmother.

[5] On July 29, 2014, DCS filed a petition alleging that B.C. was a child in need of services ("CHINS").[2] That same day, the court held an initial hearing and authorized B.C.'s continued removal from the home.

[6] On August 1, 2014, Father had a visit with B.C. at the DCS office. Father held B.C., changed him, and gave him some formula. Father laid B.C. down on his chest, and Diana Lynn Smith, the family case manager ("FCM Smith"), asked

---

[1] Father's counsel asked Dossett: "I guess you're using the word homeless to mean they didn't have a home of their own, they were what we might call couch surfing right?" Transcript at 32. Dossett answered: "Yes." *Id.*

[2] The record does not contain a copy of the petition.

Father not to fall asleep. FCM Smith was concerned because "[b]abies roll" and there was nothing to prevent B.C. from rolling to the floor. *Id.* at 83. Father said: "[W]ell I don't know what the harm would be I'll stay awake." *Id.* Father then fell asleep, and FCM Smith woke him.

[7] Dossett subsequently attempted to contact Father on several occasions and was unsuccessful because it "was difficult to get a hold of him." *Id.* at 27. At some point, Father made contact with a service provider.

[8] On August 23, 2014, Father was arrested for possession of precursors with intent to manufacture and auto theft. Father admitted to Dossett that he had been using methamphetamine during the past couple of weeks, that he had been manufacturing it, and that he needed help with his drug issue.

[9] That same month, Dossett performed another assessment because there was a concern that the paternal grandmother had taken prescription medication and had either taken too much or was under the influence and not able to care for B.C. Dossett observed that the paternal grandmother was extremely erratic in her behavior, and DCS removed B.C. from her care and placed him in foster care. When B.C. was placed in foster care, he had acid reflux.

[10] In October 2014, the court adjudicated B.C. to be a CHINS. On October 30, 2014, the court held a dispositional hearing. The court ordered Father to contact DCS upon his release from incarceration and DCS would determine services for him.

[11] In March 2015, FCM Smith met with Father in prison. Father told FCM Smith that he wanted to have visits with B.C. FCM Smith told Father that they could do that, but Father needed to sign a consent to release information between the Department of Correction and DCS so that DCS could facilitate arranging that with the provider. FCM Smith gave Father the form at the meeting, and after not hearing from him for several weeks, contacted a social worker, who had not received the form, and DCS subsequently faxed the release to the prison and eventually received the form.

[12] In the summer of 2015, Father began a program called Father Engagement which facilitated visits with B.C. and was a "special program to support fathers to help them understand how DCS works and answer questions that they may have." *Id.* at 91. Father visited with B.C. at the prison once in August 2015, twice in September, and once or twice a month in October and November.

[13] The visits lasted approximately two hours each, and Father changed B.C.'s diapers, read to him, and played with him. Terkisha Poindexter Mosbey, a Father Engagement case manager, found the visits to be appropriate. While incarcerated, Father also received multiple disciplinary reports for violating facility rules.

[14] Meanwhile, on August 24, 2015, DCS filed a petition for the involuntary termination of the parent-child relationship between Father and B.C. In September 2015, FCM Smith visited Father in prison. Father told FCM Smith that he planned to acquire a job upon his release, live with his mother, and once

he became settled wanted B.C. to live with him. FCM Smith was concerned with Father moving in with his mother because Father's mother had previously been angry that Father had seen B.C. and stated to FCM Smith that she was going to obtain a protective order against Father because he was "trying to see if his father would help supervise visits at [her] house." *Id.* at 87.

[15] On October 29, 2015, and December 3, 2015, the court held an evidentiary hearing, at the beginning of which, Father's counsel moved for a continuance and argued that she had not received a letter Father had written indicating that he wished to present witnesses at the hearing. The court denied the motion but stated that it could reconsider the motion at the end of the presentation of evidence.

[16] Dossett and FCM Smith testified to the foregoing. Dossett also testified that DCS referred Father to Cummins prior to his incarceration but she did not believe that she communicated the referral to him because she was unable to locate him. FCM Smith testified that Father Engagement was the only service that DCS could put in place within the prison system.

[17] Mother consented to adoption and testified that she did not think Father could be a parent to B.C.

> [b]ecause he could have been a parent to, you know he could
> have been a parent to [B.C.] when he came back from – even
> before he went to Pennsylvania he chose to leave his family and
> when he came back even though [B.C.] was taken from us he
> could have done the right thing and stayed out and done what I

had been doing as far as the services and everything and he chose to do what he did and landed himself where he is.

*Id.* at 46.

[18] During direct examination of Father, the following exchange occurred:

> Q.  Have you completed [any programs]?
>
> A.  The programs aren't time cut programs and they're not certificate programs; they're just facility, like volunteer programs to help.
>
> Q.  So we don't have any records that you . . .
>
> A.  I mean unless you can get count letters.  That's probably about the only record you're going to have because – either chapel records or count letters for movement will be the only way that.
>
> Q.  So we don't have anything do we?
>
> A.  Other than Father Engagement no ma'am.

*Id.* at 52.[3]

---

[3] On appeal, Father asserts that the case manager testified that he had done all he could while incarcerated and cites page 98 of the Transcript.  Our review of page 98 does not support this assertion.  Father also contends that he performed the few services available to him while incarcerated, but does not cite to the record.

[19]     When asked where he planned to live when he was released, Father stated: "I've got a residence in Covington, Indiana. I've got a residence in Terre Haute." *Id.* at 53. He explained that a friend of his moved back to Georgia and told Father that he could move in to his trailer as long as he pays the property taxes, and that he had "multiple jobs lined up." *Id.* at 54. He testified that he did not have an address to send cards to B.C, and that his other son, D., had been living at his maternal grandmother's residence since Father was incarcerated in 2008. Father stated that Dossett wanted him to go to Cummins before he was incarcerated, there should be documentation at Cummins of at least one visit, and that he returned to Indiana to reestablish the bond and relationship with family.

[20]     Father testified that he stole and was "cooking" to provide for his drug habit. *Id.* at 65. He stated that he started using methamphetamine and heroin in 2012 when he was at the Wabash Valley Correctional Facility, and that "[s]ince this incarceration I've helped myself and from fellow inmates I've also had help from people on my addiction to overcome my addiction." *Id.* He stated:

> I've been out of place a couple of times when I shouldn't have. I didn't know they were against the rules until afterwards. But there was a couple rules that were broke I admit that, but that don't show that I don't love my kids and I don't want my kids.

*Id.*

[21]     Father was released the night before the December 3, 2015 hearing at which FCM Smith testified that the reports from the visits between Father and B.C.

indicated that Father was attentive to B.C. and "that [B.C.] has undergone a lot of stress – increasing stress from being at the prison." *Id.* at 98. Mosbey, the Father Engagement case manager, testified to the foregoing and that B.C. cried a lot during the last visit, but Father appeared to know how to tend to the child's cries.

[22] Father's mother testified that Father was living with her and would continue to do so until he "can get up on his feet." *Id.* at 123. She testified that there was never a time that she told FCM Smith that she was afraid of Father, but that she was going to obtain a protective order against him "because of" B.C. and, when asked if she wanted to protect B.C. from Father, she answered: "Just from him walking into my home and getting him when they first got involved with all this." *Id.* at 126.

[23] Father testified that he was released from jail the night before the hearing and that in the morning he called his former boss who said that he was going to keep Father in mind. He testified that he tried to call Industry One and "got a voicemail, but as far as I know I still have a job with them." *Id.* at 127. He also stated that he was working on going to CDL training to drive a truck, that he would be in a position to be the full-time caregiver of B.C. within three to six months, and that he was willing to engage in whatever services DCS would require. He testified that he could use some parenting classes and, with respect to substance abuse services, stated:

> As far as substance abuse I wouldn't fully agree with it, but I'm not going to fully disagree with it either. I've been sober for the

past sixteen months, relatively fifteen. Since August twenty-third of last year I've obtained sobriety of any drugs and alcohol, but I'm not going to go against their wishes if they request that of me. I'm not going to deny them that.

*Id.* at 129. Father testified that he was going to avoid all negative people and activities. When asked how long it would take to gain custody of B.C., Father answered: "I'm pushing for six months, but there's always the possibility of setbacks, I mean a year tops. That will compensate if there's any setbacks, layoffs with work, anything like that. There's setbacks in everyday life, I mean." *Id.* at 131.

On December 4, 2015, the court entered an order terminating Father's parental rights. Specifically, the order states in part:

FINDINGS OF FACT

* * * * *

8. [B.C.] has been cared for by his foster parents since he was seven weeks old. [B.C.] struggled emotionally at first, he cried a lot, he did not sleep well, he has difficulty eating, and he has acid reflux. [B.C.] is bonded to his foster parents, particularly with his foster mother. He is insecure with other people. While [Father] has been appropriate with [B.C.] during his prison visits, [B.C.] has had some adverse reactions to his visits with [Father]. The visits lasted two hours and [B.C.] has cried at times although [Father] was able to calm the child. [Father] played and read books with [B.C.]. The supervisor of the visits did not voice any concerns about [Father's] visits with [B.C.] at the prison. However [B.C.'s] foster mother noticed that [B.C.] seemed angry, upset and frustrated after a visit with [Father].

9. The DCS' plan for [B.C.] is adoption by his foster parents.

10. The DCS is concerned that reunification of [B.C.] with [Father] is not probable because of [Father's] instability, his addiction to controlled substances, his history of criminality and incarceration and his lack of employment and stable housing. The DCS believes that because of these factors [Father] poses a threat to [B.C.].

11. The CASA believes that it is in [B.C.'s] best interests that parental rights are terminated and that [B.C.] is adopted by his foster parents.

CONCLUSIONS OF LAW

* * * * *

20. The DCS has proven by clear and convincing evidence that there is a reasonable probability that the conditions that resulted in [B.C.'s] removal and placement outside of the home of his parents will not be remedied. [Mother] signed her consent to termination and she does not believe [Father] can be an appropriate parent for [B.C.]. [Father] has led an unstable life as an adult. He has spent approximately 5 years and 9 months in prison since May 2008. He never has had responsibility for the care of [B.C.]. In the few weeks after [B.C.'s] birth and before he was back in jail [Father] did not take any positive steps to be an appropriate parent. As a result [B.C.] has been with the same foster parents since he was seven weeks old and he is bonded to his foster parents, not his biological parents. While [Father] claims he now wants to lead a stable life, get a job and place to live, and be a parent to [B.C.], his history as an adult strongly indicates that this is not probable even with intensive services to assist him to become a parent. He has another child who is older and [Father] has not been a consistent parent to that child because of his

criminal behavior, his long periods of incarceration and his abuse of controlled substances. There is no reason to believe [Father] will be able to lead a stable, sober, law-abiding life in the near future based on [Father's] adult history.

21. The DCS has proven by clear and convincing evidence that termination is in [B.C.'s] best interests. [B.C.] is bonded to his foster parents[,] and he has had minimal contact with [Father] since his birth. The child knows stability and security in the home of his foster parents who wish to adopt him. To remove [B.C.] from the only stable parents that he has known since birth is not in the child's best interests. To require [B.C.] to wait for many months or longer to see if [Father] may get to a point in the future when he might be able to provide [B.C.] with a secure, safe and permanent home is not in [B.C.'s] best interests either. It would be an injustice to [B.C.] to make him wait longer for permanency.

22. The DCS has proven by clear and convincing evidence that it has a satisfactory plan for [B.C.] after termination. The plan is for his foster parents to adopt [B.C.].

Appellant's Appendix at 4-9.

## *Discussion*

The issue is whether the evidence is sufficient to support the termination of Father's parental rights. In order to terminate a parent-child relationship, DCS is required to allege and prove, among other things:

(A) that one (1) of the following is true:

(i) The child has been removed from the parent for at least six (6) months under a dispositional decree.

(ii) A court has entered a finding under IC 31-34-21-5.6 that reasonable efforts for family preservation or reunification are not required, including a description of the court's finding, the date of the finding, and the manner in which the finding was made.

(iii) The child has been removed from the parent and has been under the supervision of a local office or probation department for at least fifteen (15) months of the most recent twenty-two (22) months, beginning with the date the child is removed from the home as a result of the child being alleged to be a child in need of services or a delinquent child;

(B) that one (1) of the following is true:

(i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.

(ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.

(iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;

(C) that termination is in the best interests of the child; and

(D) that there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2). If the court finds that the allegations in a petition described in Ind. Code § 31-35-2-4 are true, the court shall terminate the parent-child relationship. *See* Ind. Code § 31-35-2-8(a).

[26] The State's burden of proof for establishing the allegations in termination cases "is one of 'clear and convincing evidence.'" *In re G.Y.,* 904 N.E.2d 1257, 1260-1261 (Ind. 2009) (quoting Ind. Code § 31-37-14-2), *reh'g denied.* This is "a 'heightened burden of proof' reflecting termination's 'serious social consequences.'" *In re E.M.*, 4 N.E.3d 636, 642 (Ind. 2014) (quoting *In re G.Y.*, 904 N.E.2d at 1260-1261, 1260 n.1). "But weighing the evidence under that heightened standard is the trial court's prerogative—in contrast to our well-settled, highly deferential standard of review." *Id.* "We do not reweigh the evidence or determine the credibility of witnesses, but consider only the evidence that supports the judgment and the reasonable inferences to be drawn from the evidence." *Id.* (quoting *Egly v. Blackford Cnty. Dep't of Pub. Welfare*, 592 N.E.2d 1232, 1235 (Ind. 1992)). "We confine our review to two steps: whether the evidence clearly and convincingly supports the findings, and then whether the findings clearly and convincingly support the judgment." *Id.*

[27] "Reviewing whether the evidence 'clearly and convincingly' supports the findings, or the findings 'clearly and convincingly' support the judgment, is not a license to reweigh the evidence." *Id.* "[W]e do not independently determine whether that heightened standard is met, as we would under the 'constitutional harmless error standard,' which requires *the reviewing court itself* to 'be sufficiently confident to declare the error harmless beyond a reasonable doubt.'"

*Id.* (quoting *Harden v. State*, 576 N.E.2d 590, 593 (Ind. 1991) (citing *Chapman v. California*, 386 U.S. 18, 87 S. Ct. 824 (1967))). "Our review must 'give "due regard" to the trial court's opportunity to judge the credibility of the witnesses firsthand,' and 'not set aside [its] findings or judgment unless clearly erroneous.'" *Id.* (quoting *K.T.K. v. Ind. Dep't of Child Servs., Dearborn Cnty. Office*, 989 N.E.2d 1225, 1229 (Ind. 2013) (citing Ind. Trial Rule 52(A))). "Because a case that seems close on a 'dry record' may have been much more clear-cut in person, we must be careful not to substitute our judgment for the trial court when reviewing the sufficiency of the evidence." *Id.* at 640.

[28] Father argues that DCS did not establish that the reasons for removal will not be remedied or that he poses a threat to B.C.'s well-being. He cites *K.E. v. Ind. Dep't of Child Servs.*, 39 N.E.3d 641 (Ind. 2015), and *Rowlett v. Vanderburgh Cnty. Office of Family & Children*, 841 N.E.2d 615 (Ind. Ct. App. 2006), *trans. denied*. DCS argues that Father does not specifically challenge any of the court's findings and that the court's unchallenged findings support termination. DCS asserts that, while Father's desire to obtain a home and employment are commendable, his history is not.

[29] We note that the involuntary termination statute is written in the disjunctive and requires proof of only one of the circumstances listed in Ind. Code § 31-35-2-4(b)(2)(B). Because we find it to be dispositive under the facts of this case, we limit our review to whether DCS established that there was a reasonable probability that the conditions resulting in the removal or reasons for placement

of B.C. outside the home will not be remedied. *See* Ind. Code § 31-35-2-4(b)(2)(B)(i).

[30] In determining whether the conditions that resulted in the child's removal will not be remedied, we engage in a two-step analysis. *E.M.*, 4 N.E.3d at 642-643. First, we identify the conditions that led to removal, and second, we determine whether there is a reasonable probability that those conditions will not be remedied. *Id.* at 643. In the second step, the trial court must judge a parent's fitness as of the time of the termination proceeding, taking into consideration evidence of changed conditions, balancing a parent's recent improvements against habitual pattern of conduct to determine whether there is a substantial probability of future neglect or deprivation. *Id.* We entrust that delicate balance to the trial court, which has discretion to weigh a parent's prior history more heavily than efforts made only shortly before termination. *Id.* Requiring trial courts to give due regard to changed conditions does not preclude them from finding that parents' past behavior is the best predictor of their future behavior. *Id.* "The statute does not simply focus on the initial basis for a child's removal for purposes of determining whether a parent's rights should be terminated, but also those bases resulting in the continued placement outside the home." *In re N.Q.*, 996 N.E.2d 385, 392 (Ind. Ct. App. 2013) (citation and internal quotation marks omitted).

[31] As for the conditions resulting in B.C.'s removal, Dossett testified that there was a concern that Father was under the influence of drugs, that he was homeless, and that there was a concern for B.C.'s well-being. She confirmed

that Father was homeless and that, while Father denied using drugs, he tested positive for traces of methamphetamine.

[32] At the time of the December 3, 2015 hearing, Father was living with his mother, and the record reveals that B.C. was initially placed with the paternal grandmother, but there was a concern that that she had taken prescription medication and had either taken too much or was under the influence and not able to care for B.C. Dossett observed that the paternal grandmother's behavior was extremely erratic, and DCS removed B.C. from her care. FCM Smith was concerned with Father moving in with his mother because his mother had previously become angry that he had seen B.C. and stated to FCM Smith that she was going to obtain a protective order against him because he was "trying to see if his father would help supervise visits at [her] house." Transcript at 87.

[33] While Father participated in Father Engagement during his incarceration, he also was disciplined for multiple violations for which DCS presented the disciplinary/conduct reports. The reports indicate that Father was found guilty of refusing an order in December 2014, destruction of property in February 2015, "Inter w/ count" in February 2015, "VFR" in March 2015 for which Father was told to not refuse orders and to not enter an unauthorized area, horseplay in March 2015, refusing orders in April 2015, "VFR" in April 2015 for which he was told to not be in an unauthorized area, violating facility rule in May 2015, and violating facility rule in July 2015. DCS Exhibit at 9, 10, 14.

[34] FCM Smith testified:

> With [Father] as he testified we had started to provide services
> and were working towards reunification from jump and the fact
> that he violated the law and was incarcerated gives pause to look
> at his history and a considerable amount of his recent history has
> been incarceration. [B.C. is] a very young child and he needs to
> be raised in a stable environment, as does any child.

Transcript at 89. When asked what concerns she had with returning B.C. to Father once he is released from prison, FCM Smith answered:

> The history of instability, of incarceration, his moving around a
> lot. I was aware he had been out of state and back. Just, I think
> that all boils down to drug use and instability. For a very small
> child those are two very serious things to have to consider if we
> were going to reunify and to try to remedy.

*Id.* at 91. She also testified that the conditions that resulted in the out of home placement had not been remedied and that it was reasonably probable going forward that they would not be remedied.

[35] Based upon the court's findings and the record, we cannot say that it was clearly erroneous for the trial court to conclude that there was a reasonable probability that the conditions leading to B.C.'s removal would not be remedied. *See In re E.M.*, 4 N.E.3d at 649 (stating that "[b]ecause the trial court could reasonably have reached either conclusion, our deferential standard of review is dispositive," and holding that it was not clearly erroneous for the trial court to conclude the father's efforts simply came too late).

[36] As for Father's reliance on *Rowlett*, we observe that the incarcerated father in that case had participated in nearly 1,100 hours of individual and group

services, had earned twelve hours of college credit, and was enrolled in an additional eighteen hours. 841 N.E.2d at 622. To the extent that similarities between this case and *Rowlett* may have permitted the trial court to find in Father's favor, unlike *Rowlett*, the evidence was not compelling enough to require it. *See In re E.M.*, 4 N.E.3d at 647 ("The similarities between this case and *Rowlett* may have *permitted* the trial court to find in Father's favor—but unlike *Rowlett*, the evidence was not compelling enough to *require* it.").

[37] With respect to Father's reliance on *K.E.*, in which the Indiana Supreme Court reversed the trial court's order terminating a father's parental rights, we find that case distinguishable. Unlike the father in *K.E.* who was incarcerated at the time of the birth of the child, 39 N.E.3d at 644, Father was in Pennsylvania during the birth of B.C., returned to Indiana a week after B.C.'s birth, tested positive for traces of methamphetamine, and was later arrested for possession of precursors with intent to manufacture and auto theft.[4] Unlike here, the father in *K.E.* completed over twelve programs while incarcerated relating to self-improvement, parenting, and drug and alcohol abuse. *Id.* at 644. Further, nothing in the record in *K.E.* indicated that the father's plan to live with his father following his release would pose a threat to the child. *Id.* at 651. Here, Father was living with his mother who had B.C. removed from her care previously and had prior conflict with Father.

---

[4] We note that Father committed these crimes as well as escape after the birth of his other child, D.

[38]     Finally, as pointed out by DCS, Father does not specifically challenge the court's conclusion that termination was in B.C.'s best interests or that DCS had a satisfactory plan. We observe that FCM Smith testified that DCS did not feel that Father could offer B.C. a safe, stable, nurturing environment. She also recommended adoption and testified that termination was in B.C.'s best interest. And the CASA stated:

> [The foster parents] are wonderful people that have been there to be with [B.C.] when he is sick, to change his diapers, to do everything [Father] had the opportunity to do with both children. He's proven with [D.], he's already proven that he cannot be a father to [D.]. I don't even know the last time that he's seen him. This little baby that I represent has the right to be with these people that he has bonded to, that he loves and they love him and they can provide him what he needs to be a healthy, emotionally healthy person. This is about him and this is what is best for [B.C.]. In my opinion [Father's] rights should be terminated and the adoption process should happen with the [foster parents].

Transcript at 145.

## Conclusion

[39]     We conclude that the trial court's judgment terminating the parental rights of Father is supported by clear and convincing evidence. We find no error and affirm.

[40]     Affirmed.

Baker, J., and May, J., concur.